# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

ERIC LARSON,

          Plaintiff,

  v.                                          Case No. 10-C-446

WISCONSIN CENTRAL LTD.,

          Defendant.

**ORDER ON MOTIONS IN LIMINE REGARDING OPINIONS OF EXPERT ECONOMIST AND LOSS OF PENSION BENEFITS**

       Plaintiff Eric Larson (Larson) filed suit against Defendant Wisconsin Central Ltd. (WCL) on May 24, 2010, alleging violations of the Federal Employers' Liability Act (FELA), 45 U.S.C. § 51et seq. The case is before me now on Defendant's motion *in limine*, seeking an order barring the testimony of economist Stan Smith. (ECF No. 29.) A related motion seeking to bar Plaintiff from recovering damages for loss of pension benefits following his resignation from WCL is also before me. (ECF No. 47.) For the reasons discussed herein, Defendant's motion to bar Smith's testimony will be granted in part and denied in part. The motion to bar Plaintiff's claim for diminution of pension benefits will be granted.

       Plaintiff has disclosed Stan Smith, an economist, as one of his experts. Based upon his report in this case (Exhibit A), Smith proposes to offer opinion testimony as to some of the damages Larson claims to have sustained, including damages for past lost wages, a loss of future earning capacity, a loss of pension benefits and a loss of household services. Defendant's motion

is addressed only to Smith's opinions as to plaintiff's claimed damages for loss of pension benefits, loss of future earning capacity and loss of household services. Defendant contends Smith's testimony fails to meet the standards of Rule 702 of the Federal Rules of Evidence and also should be excluded under Rule 403.

Whether or not the opinion of an expert is admissible is governed by Rule 702 of the Federal Rules of Evidence, which provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto, in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

The party who proffers an expert's testimony bears the burden of establishing its admissibility under Rule 702. *Lewis v. CITGO Petroleum Corp.*, 561 F.3d 698, 705 (7th Cir. 2009); *Fail Safe, LLC. V. A.O. Smith Corp.*, 744 F. Supp. 2d 870, 887 (E.D. Wis. 2010).

In order for an expert's testimony to be admissible under Rule 702, the expert must have sufficient training, knowledge, skill, or experience so as to qualify him or her to give the proffered opinions. However, it is not enough that an expert has sufficient qualifications to provide expert testimony. *Feusting v. Zimmer, Inc.*, 421 F.3d 528, 535 (7th Cir. 2005) ("But possessing requisite credentials alone is not enough to render expert testimony admissible.") (vacated in part by *Feusting v. Zimmer, Inc.*, 448 F.3d 936 (7th Cir. 2006)). Instead, the expert's testimony must be reliable and the Court, acting as "gatekeeper", must determine that the proposed testimony meets the reliability requirements set out by the Supreme Court in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), now codified in Rule 702. Specifically, the Court

must conduct a two-step analysis: first, it must determine if the expert's testimony "is based on a reliable methodology;" second, the Court must determine if the testimony "'assists the trier of fact in understanding the evidence or in determining a fact in issue.'" *Clark v. Takata Corp.*, 192 F.3d 750, 756–57 (7th Cir. 1999) (quoting *Cummins v. Lyle Indus.*, 93 F.3d 362, 368 (7th Cir. 1996)). *See also Chapman v. Maytag Corp.*, 297 F.3d 682, 686–87 (7th Cir. 2002).

For the first step, the focus is on the methodology used and reasoning provided by the expert to support his or her opinions. The objective of the Court's inquiry into reliability "is to ensure that the opinions expressed by testifying experts 'adhere to the same standards of intellectual rigor that are demanded in their professional work.'" *Fail Safe*, 744 F. Supp. 2d at 887 (quoting from *Rosen v. Ciba-Geigy Corp.*, 78 F.3d 316, 318 (7th Cir. 1996)); *see also Frymire-Brinati v. KPMG Peat Marwick*, 2 F.3d 183, 186 (7th Cir. 1993).

The second step of the Court's *Daubert* analysis is to determine whether the testimony would assist the trier of fact. Where the expert's opinions are based upon assumptions that are unrealistic or unsupported by the record or leave the jury to speculate, they are not helpful to the jury and should be excluded. *Elcock v. Kmart Corp.*, 233 F.3d 734, 756, n.13 (3d Cir. 2000) ("a lost future earnings expert who renders an opinion about a plaintiff's future economic harm based on assumptions not present in the plaintiff's case cannot be said to 'assist the trier of fact' as Rule 702 requires."); *MDG Int'l., Inc. v. Australian Gold, Inc.*, 2009 WL 1916728 at *4 (S.D. Ind. 2009).

Finally, even if an expert's testimony passes muster under Rule 702, it is still subject to exclusion under Rule 403 if the probative value of the testimony is substantially outweighed by the likelihood of confusing or misleading the jury. According to WCL, this is a particular risk with

3

the testimony of economists like Smith where there is a "greater danger [] that the jury may accept as fact not just the faulty assumptions on which he relied, but may also accept the conclusions that are drawn through the use of those assumptions." *Tyger Constr. Co. v. Pensacola Constr. Co.*, 29 F.3d 137, 144 (4th Cir. 1994); *Fail Safe*, 744 F. Supp. 2d at 900.

The trial judges have considerable leeway in deciding how to determine the reliability of particular expert testimony, as well as in deciding whether or not an expert's testimony is reliable. *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999).

**1. Testimony on the Loss of Pension Benefits**

Among the economic losses that Smith calculated is a loss of retirement benefits that, he claims, plaintiff will sustain because of the claimed injuries. (ECF No. 31, Ex. C, at 7; *id.*, Ex. A, at 2–3.) According to Smith, the present value of this loss of pension benefits is either $271,438.00 or $295,727.00, depending on whether plaintiff is able to return to some form of gainful employment. Smith reasoned that while plaintiff would receive a railroad retirement pension for the years of service he has already put in, that pension would be less than what plaintiff would have received had he worked until age 60. (ECF No. 31, Ex. A, at 5–7.)

According to WCL, Smith's analysis is wrong, misleading, and does not accurately reflect the law with respect to plaintiff's entitlement to railroad retirement pension benefits. WCL contends that if Larson prevails on his claim that he is totally disabled as a result of WCL's negligence, he will suffer no reduction in his pension benefits because he will be credited with the years of service covering the period of disability. That Larson has been found totally disabled by the RRB and has been awarded a disability pension does not terminate his status as an employee.

WCL criticizes Smith's analysis on the ground that it "fails to recognize that any judgment for plaintiff will be subject to railroad retirement taxes for any portion of the judgment which represents compensation for time lost." (ECF No. 31 at 6.) WCL cites RRB Legal Opinion L-2010-04, which states that satisfaction of FELA judgments which include compensation for past and/or future wage loss must be reported to the RRB and allocate to the period of time the employee missed work and to future months. (ECF No. 31, Ex. E, at 3.) Additionally, the employer railroad must withhold applicable Tier I and Tier II taxes and the employee's Medicare tax obligations from payment of any judgment. WCL notes this system is consistent with FELA, in which economic awards are to compensate the plaintiff for his "pecuniary damages . . . and for that only." *Michigan Central R.R. Co. v. Vreeland*, 227 U.S. 59, 69–72 (1913). Thus, if a jury awards as damages the loss of past and future earnings Larson seeks, he will receive his full retirement pension.

But Plaintiff takes issue with WCL's criticism, particularly noting Larson formally resigned after December 31, 2011. (*See* ECF No. 31, Ex. A.) According to Larson, there is thus no basis for the RRB to collect taxes on the judgment award, meaning Smith's analysis is correct. According to the RRB webpage, "An employment relationship must exist in the months to be credited with the pay for time lost. Pay for time lost may be allocated into the future as long as an employment relationship is retained for that period. If an agreement requires that an employee must resign in order to receive the payment, the employment relationship ceases upon the resignation." (ECF No. 31, Ex. D.) Larson's resignation thus severed his employment relationship with WCL. Larson thus suggests Smith's methodology is consistent with the fact that Larson's employment relationship has ended, that neither Larson nor WCL will be paying RRB taxes on the

amount of any award made for the loss of future earnings capacity. Smith's analysis is thus consistent with RRB protocol and he will be allowed to testify.

WCL met Larson's response with a second motion to bar his claim for loss of retirement benefits now on the ground that his resignation, not any alleged negligence by WCL, caused the diminution of his pension. In fact, WCL accuses Larson of back-dating his letter of resignation and claims that he only decided to resign after he saw WCL's motion to bar Smith's testimony on the issue and realized that he would suffer no loss if he did not resign. In any event, WCL contends that Larson should not be allowed to recover for a loss he caused.

Larson vehemently denies that he back-dated his letter of resignation and contends he resigned because his WCL health benefits terminated at the end of 2010 and there was no longer a reason for him to continue his WCL employment since he knew he was totally and permanently disabled. More importantly, Larson notes that there exist strong reasons for him to resign at this time. By resigning and cutting off his employment relationship with WCL, Larson avoids the reductions for retirement and other taxes, as well as Medicare payments that would otherwise be taken out of his award for past and future wages loss. Resigning also guarantees that he will continue to receive his full disability benefit of more than $2,700 per month. If he remained an employee of WCL, any damages awarded for past wage loss or loss of future earning capacity would be treated as "paid for time lost" and terminate his right to receive disability. In fact, the Railroad Retirement Board might even be entitled to receive back what it already paid him in disability benefits. By resigning, on the other hand, he will continue to receive his full disability award which, as a collateral source, cannot reduce the amount of damages he is entitled to receive for his injury.

6

I agree with WCL that having resigned his employment and thereby cut off his right to receive a full pension, Larson cannot claim as damages the reduction he voluntarily caused. Whether he back-dated his letter of resignation or not, Larson is not entitled to recover for losses he caused. This is not to say Larson did anything wrong in electing to resign so as to avoid paying taxes on any award he may recover and the loss of his disability benefits. But he cannot have his cake and eat it too. Having cut off his obligation to pay the retirement and other taxes that would have made him eligible to receive a full retirement pension, he cannot claim that he is nevertheless entitled to recover the amount of the resulting reduction from WCL. Accordingly, WCL's motion to bar Smith's testimony on loss of pension is granted, as is its motion to bar the claim for such reduction itself.

**2. Testimony on Loss of Future Earning Capacity**

WCL also moves to bar Smith's testimony on the loss of future earning capacity. WCL first criticizes that Smith uses work-life expectancy when calculating damages when he testifies for the defendant, and life expectancy when he testifies, as here, for the plaintiff.

At his deposition, Smith offered an explanation for why he did not use plaintiff's work life expectancy in this case in determining damages for loss of future earning capacity, i.e., why his estimation of damages is based on the assumption that plaintiff would have continued to work for the rest of his life, but for the accident. He explains that his method takes into account how long a specific plaintiff claims he or she wanted to work. (ECF No. 31, Ex. C, at 40–41.) Larson told Smith's assistant that he would have retired at 65, but for the accident, yet Smith does not stop at

7

age 65. Instead, he estimated damages to plaintiff's life expectancy (of age 79), explaining that plaintiff might change his mind about retiring. (ECF No. 31, Ex. C, at 35.)

Smith provides no basis for the assumption that, but for the accident, plaintiff would have continued to work for the rest of his life expectancy. Indeed, Smith testified at his deposition that he had no opinion as to plaintiff's work life expectancy. Instead, he said he would leave it up to the jury to decide that issue. (ECF No. 31, Ex. C, at 34.) However, Smith explicitly states that "the losses from working full-time through any assumed retirement age can be read off the table." (ECF No. 31, Ex. A, at 3.) In other words, he provides the jury with all the tools necessary to assess what the damages value should be that would correspond with each possible retirement age. His testimony is therefore permissible. WCL tries to bolster its claim by citing *Elcock*, in which the expert disregarded the medical evidence that the plaintiff's work-life would be cut in half due to her diabetes. 233 F.3d at 756. But in *Elcock* the expert ignored the "real world" of the plaintiff. *Id.* Here, Smith did not ignore the circumstances affecting Larson's future wage loss. Instead, Smith provided different estimates of Larson's future wage loss corresponding with different ages at which Larson might have retired without injury. Consequently Smith's testimony is not deficient in this regard.

WCL also cites Section 502 of the Railroad Retirement Solvency Act of 1983, Public Law 98-76, under which the RRB is required to submit an actuarial study to Congress annually that projects the revenues and payments of the railroad retirement system. The most recent study was submitted to Congress in 2009. The study shows that a substantial majority of railroad employees retire at age 60 if they have 30 years of service, since they then would qualify for unreduced pension benefits. (ECF No. 31, Ex. J, at 52.) WCL posits this would have been Larson's situation,

8

had there been no injury. Smith dismissed this study, as well as a study done by two economists, James Ciecka and Gary Skoog. WCL likens these dismissals to a dismissal in *Fail Safe* which the Court found "unwarranted" in part because of "outright blindness to contrary evidence." 744 F. Supp. 2d at 889.

But the Ciecka and Skoog tables were created by the American Association of Railroads (AAR) — a trade group of all class I railroads in America, not a governmental entity. Plaintiff notes the tables are not generally accepted work-life expectancy tables because they do not rely on data assembled as a means of estimating loss, but rely only on the average retirement age of railroad workers. *See Thakore v. Universal Mach. Co. Of Pottstown, Inc.*, 679 F. Supp. 2d 705, 730 (N.D. Ill. 2009). Furthermore, the methodology underlying the Ciecka and Skoog tables has never been tested or peer-reviewed and similar tables have been held unreliable in the field for several reasons. For instance, the tables do not compare work-life within Plaintiff's particular field with the national average nor with the work-life of any other occupation. *See, e.g., Marcel v. Placid Oil Co.*, 11 F.3d 563, 567 (5th Cir. 1993) (barring an economist from testifying at trial in part because his proposed testimony did not include any evidence comparing work-life within the plaintiff's particular field with the national average or work-life of any other occupation). Furthermore, the Ciecka and Skoog tables are based on the average retirement age of employees with circumstances different from Plaintiff's. *See Burrows v. Union Pacific Railroad Co.*, 218 S.W.3d 527, 540 (Mo. Ct. App. 2007) (evidence of the average age of retirement was based on "other, unnamed, former employees with circumstances dissimilar to" the plaintiff's would not prove or disprove when plaintiff planned to retire). Consequently, Smith's refusal to include the

9

Ciecka and Skoog table in his analysis does not violate *Daubert* or raise issues with his methodology.

WCL also takes issue with the fact that Smith seems to change his methodology depending on whether he is testifying for the plaintiff or defendant in a case. Courts in this circuit have determined it is inappropriate for an expert to use particular data or assumptions simply because counsel asks for it. *See, e.g.*, *Lyman v. St. Judge Med. S.C., Inc.*, 580 F. Supp. 2d 719, 726 (E.D. Wis. 2009); *MDG Int'l.*, 2009 WL 1916728 at *4. The rationale for this rule is that experts are supposed to use "the same standards of intellectual rigor that are in demanded in [their] professional work." *Rosen v. Ciba-Geigy Corp.*, 78 F.3d 316, 318 (7th Cir. 1996). However, as Larson notes, Defendant's contention here with Smith's testimony is not about the validity or reliability of his methodology but rather the credibility of his testimony. Defendants do not point to substantial differences or weakness in the methodology Smith used here but rather stress that it is different. Consequently, Plaintiff correctly notes, the issue should be raised on cross-examination and not in a *Daubert* motion. *See Smith v. Ford Motor Co.*, 215 F.3d 713, 719 (7th Cir. 2000) (noting "the question of whether the expert is credible or whether his or her theories are correct given the circumstances of a particular case is a factual one that is left for the jury to determine after opposing counsel has been provided the opportunity to cross-examine the expert regarding his conclusions and the facts on which they are based").

WCL finally tries to exclude Smith's testimony under Rule 403, stating its value is "substantially outweighed by the risk of misleading or confusing the jury." (ECF No. 31 at 17.) But WCL's only support for this conclusion is that Smith will come to court "dressed as an expert economist" and posits the jury would simply award all of the damages Smith has calculated. (*Id.*)

10

This view misses the value of jurors, who are more than adequately situated to assess Smith's testimony and are not likely to be persuaded simply because of Smith's title or role. Again, WCL may use cross-examination to cast doubt on Smith's credibility, but to say a jury will simply take what he says at face value is to underestimate the jury's assessment powers. WCL's argument on this ground is accordingly rejected.

**3. Testimony as to Loss of Household Services**

Smith also attempts, in his report, to determine the damages Larson has sustained because he can no longer perform certain household services. Based on a telephone interview with Larson conducted by one of his staff members, as well as looking at a chart from the Bureau of Labor Statistics, Smith determined Larson's ability to perform household services has been reduced by 75%. However, Smith does not explain how he reached the 75% figure. *See, e.g.*, *Davis v. Rocor Int'l*, 226 F. Supp. 2d 839, 842 (S.D. Miss. 2002) (barring testimony when an expert's opinion "with regard to lost household services and their corresponding monetary value [] appears to be based on conjecture and/or speculation that is not supported by the record and is not within his personal, scientific knowledge."). Defendants thus argue here that Smith's determination is not supported by the record.

But Defendant misunderstands Smith's role in the case. He is not a vocational expert, nor is he a treating physician; in other words, he does not have the tools to assess whether or not Larson is telling the truth about his decreased ability to perform household services. Instead, that type of credibility determination is best left to the jury. Instead, Smith appropriately performs the role of

11

an economist and provides a value corresponding to the information he'd been provided by Larson and Larson's physician. His testimony on the loss of household services is accordingly permissible.

In conclusion, Smith's testimony as to the loss of future earning capacity is within the confines of *Daubert* and will be allowed in court. Smith's testimony as to the loss of the value of household services is also permissible. But Smith's testimony on pension benefits is barred, in accordance with WCL's later motion to bar Larson's claim for reduced retirement benefits. Thus, WCL's motion *in limine* to bar Smith's testimony (ECF No. 29) is accordingly GRANTED in part and DENIED in part. WCL's motion to bar Larson's claim for reduced retirement benefits (ECF No. 47) is GRANTED.

Dated this   2nd   day of February, 2012.

 s/ William C. Griesbach
William C. Griesbach
United States District Judge